**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 20-CR-177** |
| | : | |
| | : | **JUDGE TIMOTHY S. BLACK** |
| **v.** | : | |
| | : | **UNITED STATES' TRIAL BRIEF** |
| | : | |
| **LARRY HOUSEHOLDER et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

The United States of America, by and through the undersigned Assistant United States Attorneys, respectfully submits this Trial Brief for the Court's consideration, which summarizes the Government's evidence, and outlines potential issues that may be presented before the Court over the course of trial and may require the Court's intervention to address.

## SUMMARY OF THE EVIDENCE

Defendant Larry Householder and Defendant Matthew Borges are charged with conspiring to participate in a racketeering enterprise through acts indictable under federal and state bribery and money laundering statutes. (Doc. 22, PageID 1247 (Indictment)).

In 2016, Defendant Householder began planning his election as Speaker of the Ohio House of Representatives. To support his plan, the enterprise created Generation Now as a 501(c)(4) entity so that Defendant Householder could receive untraceable corporate contributions, including quarterly $250,000 bribe payments from FirstEnergy Serv. Co. starting in March 2017, in return for his agreement to help pass legislation to bailout FirstEnergy's nuclear power plants. Defendant Householder used these payments to recruit and support "team Householder" candidates in the 2018 primary and general elections. When Defendant Householder needed additional funds to

1

support his candidates, FirstEnergy executives came through with additional 501(c)(4) payments. These payments were funneled through corporate entities controlled by the enterprise before being spent on Defendant Householder's campaign and team Householder candidates. Defendant Borges worked directly with enterprise members to assist team Householder candidates. These facts will be supported by recorded phone calls involving Defendant Householder; defendant and co-conspirator statements, including text messages and emails between the bribe payors and members of Householder's team; witness testimony; and documentary evidence, including business records and summaries, incorporation documents, and documents from enterprise members and associates.

The scheme was successful – in January 2019, Defendant Householder was elected Speaker, and he immediately began his efforts to pass the nuclear bailout legislation. But, shortly after introducing the legislation, Defendant Householder and enterprise members told FirstEnergy executives and agents that they needed millions of dollars in additional payments through Generation Now to pass the legislation. Bank records show that, beginning in April 2019, FirstEnergy Serv. Co. began paying what totaled over $16 million dollars to Generation Now to fund Defendant Householder's team and help pass the legislation in the House and Senate. Defendant Borges worked directly with enterprise members and associates to further these efforts and help pass the nuclear legislation, introduced as House Bill 6. Defendant and co-conspirator statements detail their efforts to pass the legislation through the House and Senate, aided by FirstEnergy Serv. Co. payments into Generation Now.

At the same time, a co-conspirator, Defendant Neil Clark, was meeting with undercover agents ("UCEs"), describing Defendant Householder's control of Generation Now and how the UCEs could pay money to Defendant Householder to advance sports betting legislation in Ohio,

money that could ultimately be used to support Householder's House Bill 6 efforts.  Following a meeting with Defendant Householder, Clark told a UCE that they should contribute to Generation Now or another Householder "term limits" 501(c)(4), and that Householder's staff was working on the legislation as discussed at the meeting.  Recorded meetings, recorded telephone calls, and phone records detail these interactions.

After House Bill 6 was signed by the governor, a campaign to overturn House Bill 6 through a ballot initiative began.  Continuing the corrupt agreement, Defendant Householder and FirstEnergy executives discussed the steps Defendant Householder would take to defeat the ballot campaign.  In response, FirstEnergy Serv. Co. paid Defendant Householder over $38 million through Generation Now—some of which FirstEnergy first paid through its own secret 501(c)(4) account—in return for Householder and the enterprise's efforts to defeat the ballot campaign through official action by Defendant Householder, paying off employees and agents of the ballot campaign to prevent the campaign from collecting signatures, and a media offensive and "placebo" initiative to defeat the ballot campaign, among other tactics.  This also included creating corporate entities to funnel FirstEnergy-to-Generation-Now money before spending it to advance the enterprise's efforts.

Defendant Borges knowingly received $1.6 million of the proceeds funneled from FirstEnergy Serv. Co., to Generation Now, to Defendant Borges's contemporaneously incorporated entity, 17 Consulting.  Defendant Borges used these payments to further the enterprise with knowledge of the "unholy alliance"—that is, the corrupt agreement—between Defendant Householder and FirstEnergy.  Defendant Borges took a leading role and worked directly with enterprise members and associates on both sides of the corrupt agreement to defeat the ballot campaign.  He also solicited and bribed an employee of an entity furthering the ballot

3

campaign and transferred proceeds of the corrupt agreement through his personal account before using it to further the enterprise's efforts. This evidence is supported by bank records and incorporation documents, defendant and co-conspirator statements in text messages, documentary evidence, recorded calls and meetings, and witness testimony.

Ultimately, the defendants' efforts through the enterprise were successful – the ballot campaign was unable to collect enough signatures to put the initiative on the ballot and House Bill 6 became law. Millions of dollars in FirstEnergy payments remained in Generation Now after the enterprise's successful efforts. The defendants' benefited from the proceeds, including enriching themselves personally, paying off personal debts, continuing to pay for Defendant Householder's operations and staff, and funding a new crop of team Householder candidates in the winter and spring of 2020. Defendant Householder also solicited and received an additional $2 million from FirstEnergy Serv. Co. in March 2020 to fund his term limit initiative and ensure that he could remain in power as Speaker and continue to further FirstEnergy's interests in that role. This is supported by bank and financial records, defendant and co-conspirator text messages, and witness testimony.

## **POTENTIAL TRIAL ISSUES**

The Government submits that the following are potential issues that might be presented before the Court over the course of trial.[1]

---

[1] Although there is some overlap in topics, the following issues are distinct from motions *in limine* in that this brief aims to highlight for the Court potential issues that will likely arise during trial while motions *in limine* ask the Court for an affirmative pretrial ruling as to those issues.

**A. Evidentiary Issues**

    **1. <u>Authentication of Evidence Through Certification</u>**

        a) <u>Business Records (Non-Electronic)</u>

The Government will seek to admit business records at trial. Based upon the certifications of records custodians, the Government submits that the records are self-authenticating.

Federal Rule of Evidence 902(11) identifies certifies records of a regularly conducted activity to be self-authenticating if certain conditions are met. First, the records must be accompanied by "a certification of the custodian or another qualified person[.]" *Id*. That certification must assert that: "[1] the record was made at or near the time by—or from information transmitted by—someone with knowledge; [2] the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [3] making the record was a regular practice of that activity[.]" Fed. R. Evid. 803(6)(A)-(C); *see* Fed. R. Evid. 902(11) (requiring certification meet the requirements of Rule 803(6)(A)-(C)). Second, the Government must give the defendant "reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." Fed. R. Evid. 902(11).

Earlier today, the Government provided detailed notice of the records it intends to offer as self-authenticating, and attached the record custodians' certifications with the notice for the defendants' inspection. (*See* Doc. 176.)

        b) <u>Records from Electronic Process / Data Copied from Electronic Device</u>

The Government will also seek to admit records generated by an electronic process or system and data copied from an electronic device, storage, medium, or file. This evidence is also self-authenticating, provided it is certified pursuant to the requirements previously described and

the Government provides notice to the defendants that it intends to introduce the evidence this way. *See* Fed. R. Evid. 902(13) & (14).

This process may be used even for cell phone extractions, with the certifications completed by the government agents who performed the extraction. *See United States* v. *Anderson*, 563 F. Supp. 3d 691, 695 (E.D. Mich. 2021) (relying on *United States* v. *Dunnican*, 961 F.3d 859 (6th Cir. 2020)).

As with the business records, earlier today, the Government provided detailed notice to the defendants of the electronic evidence it intends to offer as self-authenticating, and included the record custodians' certifications with the notice for the defendants' inspection. (*See* Doc. 176.)

Based on these certifications, the Government does not intend to call records custodians to provide authentication testimony for the corresponding records, forensic extractions, and wire intercepts.

### 2. Coconspirator and Agent Statements Are Admissible

At trial, the Government will seek to introduce statements of coconspirators—whether charged or uncharged—made in furtherance of the conspiracy. As this Court already recognized in its pretrial ruling on the motions *in limine*, Federal Rule of Evidence 801(d)(2)(E) explains that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. To admit such statements, "a trial court must find that: (1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy." *United States* v. *Warman*, 578 F.3d 320, 335 (6th

Cir. 2009). The trial court "may admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Id*. (internal quotation marks omitted).

The Government will also seek to introduce statements of agents of coconspirators, made in furtherance of the conspiracy. As this Court noted in its order on the motions *in limine*, Federal Rule of Evidence 801(d)(2)(C)-(D) provides that a statement is not hearsay if it is offered against an opposing party and "was made by a person whom the party authorized to make a statement on the subject" or "was made by the party's agent or employee on a matter within the scope that relationship and while it existed[.]" *See, e.g.*, *United States* v. *Faymore*, 736 F.2d 328, 334-35 (6th Cir. 1984). The agent "need not have authority to make the statement at issue, but rather the subject of the statement must relate to the employee's area of authority." *United States* v. *Brothers Cons. Co.*, 219 F.3d 300, 311 (4th Cir. 2000).

The Government reiterates its intent to offer such statements at trial, "subject to the Government meeting its burden of proof[,]" as this Court has previously authorized. (*See* Doc. 161, PageID 3932.) The offering will include statements made by employees of First Energy Corp. First Energy Corp. admitted in its Deferred Prosecution Agreement that "FirstEnergy Corp., through the acts of its officers, employees, and agents, conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action." (21-CR-86, Doc. 3, PageID 75.) While the Deferred Prosecution Agreement will not be introduced at trial, FirstEnergy Corp.'s admissions made within

it form the factual basis to admit statements made by employees or agents of FirstEnergy Corp. made in furtherance of the conspiracy.

At the close of its case, the Government will marshal the evidence presented and move formally for the admission of the coconspirator and agent testimony previously admitted conditionally at trial.

### 3. Admission of Publicly Available Materials

The Government will seek to admit some evidence at trial that was obtained through open sources. Specifically, the Government will seek to admit the following: (1) Exhibit 282 - One United Ohio Form 990 (2018); (2) Exhibits 283, 301A, 301B, and 340 – Federal Election Commission ("FEC") filings; (3) Exhibit 311 - Kevin Black ad; (4) Exhibit 423 – Ohio House of Representatives press release about committees (2.6.19); (5) Exhibit 424 - Ohio House of Representatives press release about committee members (2.8.19); and (6) Exhibit 457 - HB 6 press conference video.[2]

In order to "satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. "Authentication is a relatively low hurdle, and may be proved through a variety of methods, including circumstantial evidence." *United States* v. *Quintana*, 763 F. App'x 422, 426 (6th Cir. 2019) (internal citations, quotation marks, and brackets omitted). The Government examines the authenticity of each proposed open-source exhibit in turn.

---

[2] The Government may seek to admit additional exhibits that were obtained through publicly available means.

Exhibit 282 – One United Ohio 990 Form

Exhibit 282 is a Form 990 completed for One Ohio United, Inc., a 501(c)(4) organization, and signed by the president of the organization.  The Internal Revenue Service maintains the Form 990s for tax exempt organizations and makes them available for public inspection.[3]  As the Internal Revenue Service is a public office that recorded the document and its filing as authorized by law, the Government submits that Exhibit 282 is authentic.  *See* Fed. R. Evid. 901(b)(7) (authentication requirement satisfied by evidence that "a document was recorded or filed in a public office as authorized by law").

Exhibits 283, 301A, 301B, and 340 – FEC filings

Exhibit 283 is an FEC filing for Hardworking Americans in 2018.[4]  Exhibit 301A is the Growth & Opportunity PAC Statement of Organization filed with the FEC in 2015.[5]  Exhibit 301B is the Growth & Opportunity PAC 2018 mid-year FEC report.[6]  Exhibit 340 is the Growth & Opportunity PAC April 2020 FEC report.[7]

The FEC "is the independent regulatory agency charged with administering and enforcing

---

[3] An electronic copy of the Form 990 can be found at:
https://apps.irs.gov/pub/epostcard/cor/274462638_201812_990O_2019082316592507.pdf

[4] Available at:
https://docquery.fec.gov/pdf/426/201809269124245426/201809269124245426.pdf

[5] Available at:
https://docquery.fec.gov/pdf/668/201507019000051668/201507019000051668.pdf

[6] Available at:
https://docquery.fec.gov/pdf/041/201807159115629041/201807159115629041.pdf

[7] Available at:
https://docquery.fec.gov/pdf/560/202004169219664560/202004169219664560.pdf

the federal campaign finance law." FEC website, "Mission and history," (available at: https://www.fec.gov/about/mission-and-history/). As part of their responsibilities, the FEC maintains campaign finance information and makes it available to the public. *See* FEC website, "Open government at the Federal Election Commission," (available at: https://www.fec.gov/about/open/). Like the Internal Revenue Service, the FEC is a public office that recorded these documents and their filing as authorized by law. *See* Fed. R. Evid. 901(b)(7) (authentication requirement satisfied by evidence that "a document was recorded or filed in a public office as authorized by law"). The Government submits that these exhibits are authentic.

<u>Exhibit 311 – Kevin Black ad</u>

Exhibit 311 is a political advertisement, attributed to Hardworking Americans Committee, which attacks politician Kevin Black.[8] On October 22, 2022, FBI personnel located the video while conducting open-source searches for ads posted and paid for by the Hardworking Americans Committee. The search led to a URL https://larryhouseholderfightsforus.com. The video that played there resolved to a video site called Vimeo, where it had been posted by an account called "TSGCO." Within the list of other videos posted by the account TSGCO was Exhibit 311, which had been posted by TSGCO on April 26, 2018.

Web searches reveal that TSGCO is an acronym for The Strategy Group, Co. *See* The Strategy Group, Co. website (available at: www.tsgco.com). The Strategy Group's listed address is 7669 Stagers Loop, Delaware, OH. *Id*. The Strategy Group's listed COO is Scott Schweitzer. *See* https://www.tsgco.com/specialists.

Bank records obtained through this investigation revealed that Scott Schweitzer is the signatory on a bank account for New Day Media, LLC, with an address listed of 7669 Stagers

---

[8] Available at: https://vimeo.com/266780570

Loop, Delaware, OH.  On April 26, 2018 (the same day Exhibit 311 was posted by TSGCO), the New Day Media, LLC bank account received a $404,000 internal wire transfer credit. Hardworking Americans Committee, in turn, reported a $404,000 disbursement, dated April 29, 2018, to New Day Media, LLC for "Advertising against Ohio House Candidate Kevin Black." *See* Exhibit 283.[9]

In addition to these records, there is an April 27, 2018, email from Scott Schweitzer at sschweitzer@tsgco.com to Defendant Householder, among others, with the subject line "Hardworking Americans PAC."  *See* Exhibit 310A.  In that email, Mr. Schweitzer sends a hyperlink to "Dirty Money Dirty Politics," which he writes "[a]ttacks Black for being bankrolled by outside interests and being backed by Cliff Rosenberger."  *Id*.

There is also a recorded conversation between Defendant Householder and Neil Clark, which occurred less than a month before the ad was posted, that appears to reference this ad.  *See* Exhibit 312B (Householder: "I kind of like the word 'Dark' because his name is Black.").

Based on all these facts, the Government submits that Exhibit 311, the video of the anti-Black campaign ad, is authentic and may be admitted into evidence.[10]  *See United States* v. *Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011) (authenticity may be proven with circumstantial evidence).

<u>Exhibits 423 and 424 – Ohio House of Representatives Press Releases</u>

Exhibits 423 and 424 are screenshots of Ohio House of Representatives press releases dated

---

[9] The evidence at trial will show that money from FirstEnergy ultimately funded Hardworking American's effort to target Defendant Householder's opponent, Kevin Black, in the 2018 primary.

[10] The exhibit does not constitute hearsay, as the Government is not offering it for the truth of the contents of the ad.  *See* Fed. R. Evid. 801(c)(2).

February 6, 2019, and February 8, 2019.[11]  The dates on which the screenshots were taken appear along the top or bottom of each exhibit.  The website from which these screenshots were taken is www.ohiohouse.gov, which is the official website of the Ohio House of Representatives.  *See* www.ohiohouse.gov (copyright at bottom of page held by "Ohio House of Representatives"); Official State of Ohio site Ohio House of Representatives page[12] (containing "LAUNCH Ohio House of Representatives" button that hyperlinks to www.ohiohouse.gov).  An agent who has reviewed the press releases will testify.

These facts—the text of the releases is still posted on the official Ohio House of Representatives website, the web design of the screenshots matches archived copies of the official website, an agent familiar with the screenshots will testify—provide sufficient evidence to conclude that the two exhibits are authentic and should be admitted at trial.  *See United States* v. *Needham*, 852 F.3d 830, 836 (8th Cir. 2017) (screenshots of preserved version of website properly admitted, because "[e]xhibits depicting online content may be authenticated by a person's testimony that he is familiar with the online content and that the exhibits are in the same format as the online content"); *see, e.g.*, *United States* v. *Nicolescu*, 1:16-CR-224, 2019 WL 998599, at *2

---

[11] The text of the press releases (albeit with different background web design and Defendant Householder's picture removed) is currently available at:
https://ohiohouse.gov/news/republican/speaker-householder-announces-standing-committee-assignments-99325 and https://ohiohouse.gov/news/republican/ohio-house-approves-rules-for-133rd-general-assembly-99298.  The web design of the screenshots can be seen in archived copies of the ohiohouse.gov website from a date close in time to the date the screenshots were made.  *Compare* https://web.archive.org/web/20200607015756/http://www.ohiohouse.gov/larry-householder/press/speaker-householder-issues-statement-on-house-bill-6 (archived on June 6, 2020) *with* Exhibits 423 and 424 (screenshotted June 24, 2020, and May 6, 2020, respectively).

[12] Available at: https://ohio.gov/government/resources/ohio-house-of-representatives#:~:text=Ohio%20House%20of%20Representatives%20%7C%20Ohio,of%20the%20State%20of%20Ohio.  At the top of the page, there is a banner that reads "An official State of Ohio site.  Here's how you know."  Clicking on the banner reveals text, which reads, in part: "An Ohio.gov website belongs to an official government organization in the State of Ohio."

(N.D.O.H. March 1, 2019) (Government met *prima facie* burden of authentication of Google search screenshots).

Exhibit 457 – House Bill 6 Press Conference Video

Exhibit 457 is a video recording of The Ohio Channel's broadcast of Defendant Householder's April 12, 2019, press conference about House Bill 6.  The Ohio Channel is "a service of Ohio's public broadcasting stations" that includes "live Statehouse programming supplied by Ohio Government Telecommunications[.]"  The Ohio Channel, "About the Ohio Channel," available at: https://www.ohiochannel.org/about.  A copy of the video is posted at The Ohio Channel's website.[13]  Defendant Householder appears prominently in the video, conducts the presentation, and takes questions from the assembled reporters.

The Government submits that this video recording is self-authenticating, based on what it depicts (Defendant Householder leading a press conference, making statements in his capacity as Speaker) and its attribution (a banner for The Ohio Channel, a public broadcasting resource, appears at the bottom of the video, and the video is posted on The Ohio Channel's website).  *See United States* v. *Damrah*, 412 F.3d 618, 628 (6th Cir. 2005) (district court did not abuse discretion holding that videotapes of the defendant were self-authenticating); *see also* Fed. R. Evid. 901(4) Advisory Committee Note ("The characteristics of the offered item itself, considered in the light of the circumstances, afford authentication techniques in great variety."); *cf. In re Chicago Flood Litigation*, 93 C 1214, 1995 WL 437501, at *5 (N.D. Ill. July 21, 1995) (testimony of mayor not required to authenticate press conference tape because tape "may be authenticated through other means").

---

[13] Available at: https://www.ohiochannel.org/video/press-conference-4-12-2019-ohio-clean-air-program

### 4. **Summary Exhibits Are Admissible**

This case involves thousands of pages of records and numerous events occurring over a five-year period. To present more efficiently certain voluminous or otherwise difficult to review evidence to the jury, the Government intends to offer summary exhibits pursuant Federal Rule of Evidence Rule 1006. Specifically, the Government will seek to admit summaries of phone records and financial records.

Under Rule 1006, the Government may use a summary, chart, or calculation to prove the content of voluminous writings that cannot be conveniently examined in court. Rule 1006 of the Federal Rules of Evidence allows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

Summary evidence admitted pursuant to the Rule must meet five requirements. First, the evidence must be voluminous such that it "cannot conveniently be examined in court" by the jury. *United States* v. *Bray*, 139 F.3d 1104, 1109–10 (6th Cir. 1998). The phone records and financial records here are certainly voluminous, constituting thousands of pages of documents and rows of spreadsheets.

Second, the proponent of the summary must also have made the items "available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006; *Bray*, 139 F.3d at 1109. The Government provided the defense with the discovery items containing the underlying information, providing the defense with ample time to examine the evidence.

14

Third, "the proponent of the summary must establish that the underlying documents are admissible in evidence." *Martin* v. *Funtime, Inc*., 963 F.2d 110, 116 (6th Cir. 1992) (emphasis omitted) (quoting *United States* v. *Johnson*, 594 F.2d 1253, 1256 (9th Cir. 1979)). The phone records and financial records are admissible as domestic records of a regularly conducted activity, pursuant to Federal Rule of Evidence 902(11), and will be certified as discussed *supra*.

Fourth, the summary document "must be accurate and nonprejudicial." *Bray*, 139 F.3d at 1110. The summary exhibits will be provided to the Court and defense counsel pre-trial for inspection on this point, and the Government will have witnesses to testify to their accuracy.

Finally, a summary document must be "properly introduced before it may be admitted into evidence." *Id.* (quotation marks omitted). To lay a proper foundation for a summary, the proponent should present the testimony of the witness who supervised its preparation. *See Scales*, 594 F.2d at 563; *United States* v. *Harris*, 881 F.3d 945, 951 (6th Cir. 2018). A witness need not have personally prepared the summary exhibit. It is sufficient if the witness testifies that he or she supervised others who reviewed the raw data and prepared the summary, and that the witness then reviewed the summary. *United States* v. *Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014). The expertise involved in creating the summary does not render the witness an expert witness; whatever opinions may be in the chart are lay witness, not expert, opinions. *See United States* v. *Georgiou*, 777 F.3d 125, 144 (3d Cir. 2015); Fed. R. Evid. 701. As mentioned, the Government will offer such a witness for all the summary exhibits it seeks to admit.

The Government will also seek to admit summary exhibits that are more precisely classified as secondary summaries under Sixth Circuit law. *See United States* v. *Kerley*, 784 F.3d 327, 341 (6th Cir. 2015) ("Secondary-evidence summaries are a hybrid of summaries admitted under Federal Rule of Evidence 1006 and pedagogical-device summaries."); *United States* v. *Bray*,

139 F.3d 1104, 1109 (6th Cir. 1998) ("[S]econdary-evidence summaries are admitted in evidence not in lieu of the evidence they summarize but in addition thereto, because in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence." (emphasis omitted)).[14]

Summary exhibits—both primary and secondary—have been admitted in a variety of criminal cases, and have distilled broad categories of information, including phone records, location data, employee pay stubs, and communications like text messages. As the Sixth Circuit has repeatedly concluded, admission of such compilations is proper. *E.g.*, *United States* v. *Williams*, 952 F.2d 1504, 1519 (6th Cir. 1991) (three charts compiling information from telephone records, surveillance and tape recordings, which amounted to a chronology of significant events on particular days, admissible under Rule 1006); *Kerley*, 784 F.3d at 341 (upholding admission of secondary summaries that accurately and reliably depicted admitted evidence of eight real estate transactions).

### 5.  The Government Will Seek to Admit Transcripts of Recordings

The Government intends to present to the jury transcripts of recordings offered into evidence at trial. The transcripts correspond to recordings of phone calls and in-person meetings.

A transcript of admissible recordings may be presented to the jury so that the jury may follow recordings more easily. *United States* v. *Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). Transcripts are generally not submitted to the jury as evidence unless the parties stipulate to their accuracy. *Id.*; *United States* v. *Vinson*, 606 F.2d 149, 155 (6th Cir. 1979); *see* Sixth Cir. Pattern

---

[14] Anticipating the introduction of summary exhibits at trial, the United States included Sixth Circuit Pattern Instruction 7.12A (Secondary-Evidence Summaries Admitted in Evidence) in its list of requested jury instructions.

Inst. 7.17. Where the parties stipulate to accuracy, the transcripts and the recordings may be submitted to the jury as evidence. *Robinson*, 707 F.2d 8 at 876. The Sixth Circuit has encouraged parties to stipulate to the accuracy of transcripts prior to trial. *United States* v. *Segines*, 17 F.3d 847, 854 (6th Cir. 1994) ("The preferred method is stipulation to its accuracy by all parties."). But even in the absence of a stipulation, transcripts may still be admitted, provided "the transcriber . . . verif[ies] that he or she has listened to the tape and accurately transcribed its content" and the district court "make[s] an independent determination of accuracy by reading the transcript against the tape." *United States* v. *Fults*, 639 F. App'x 366, 371 (6th Cir. 2016) (quoting *Robinson*, 707 F.2d at 878-79).

Here, the Government provided draft transcripts to the defendants and invited their edits by December 30th. The defendants have not proposed any edits to the transcripts, so the Government intends to seek their admission as exhibits at trial as accurate transcripts.

## B. Improper Arguments

### 1. <u>Improper Argument in Voir Dire or Opening Statement</u>

The Government will object to argument or advocacy relating to the facts of the case during voir dire. "The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel." *United States* v. *Anderson*, 562 F.2d 394, 398 (6th Cir. 1977). "*Voir dire* is a search for the individual's qualifications to sit as a fair and impartial juror, *i.e.* can the juror be unbiased and fair – not an advocacy phase of the trial." *Rhoden* v. *Morgan*, 97 F.3d 1452, 1996 WL 515348, at *7 (6th Cir. 1996) (table). This means "[t]he opportunity to question jurors personally should be used solely to obtain information for the intelligent exercise of challenges. Defense counsel should not

17

intentionally use the voir dire to . . . argue counsel's case to the jury." *Id*. (quoting The American Bar Association Standards for Criminal Justice: Defense Function, Standard 4–7.2 (3d ed. 1993)).

Nor should the defendants be permitted to make inappropriate arguments during opening statements. Opening statements are "designed to allow each party to present an objective overview of the evidence intended to be introduced trial." *United States* v. *Burns*, 298 F.3d 523, 543 (6th Cir. 2002). This purpose is a "narrow" one, and an opening statement is best understood as a "brief statement of the issues and an outline of what will be supported with competent and admissible evidence." *United States* v. *Thomas*, 41 F.3d 1508, 1994 WL 645725, at *4 (6th Cir. 1994) (table). It is not an opportunity for either side to make arguments to the jury. *Testa* v. *Village of Mundelein, Ill.*, 89 F.3d 443, 446 (7th Cir. 1996) ("The purpose of an opening statement is to state what evidence will be presented, to make it easier for jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole. It is not an occasion for argument."); *see* Benchbook for U.S. District Court Judges, Sixth Ed., 2.07 Preliminary Jury Instructions – Criminal Case, at 96 (March 2013) ("Opening statements are neither evidence nor arguments.").

District courts have "discretionary control over opening statements, including the power to exclude irrelevant matters." *United States* v. *Poindexter*, 942 F.2d 354, 360 (6th Cir. 1991). "A district court's supervisory powers over opening statements include the power to interrupt counsel who is presenting argument during opening." *Cox* v. *Treadway*, 75 F.3d 230, 237 (6th Cir. 1996); *accord United States* v. *Pits*, 85 F.3d 629, 1996 WL 254655, at *2 (6th Cir. 1996) (table); *see, e.g.*, *Thomas*, 41 F.3d 1508, at *4.

If defense counsel chooses to make opening statements at this trial, and wish to use evidence, exhibits, or demonstratives before the jury during their opening statements, the Government would like an opportunity to review those materials in advance of trial. *See, e.g.*,

18

*Burns*, 298 F.3d at 542–43 (Government provided opening statement PowerPoint presentation to defense in advance of trial).  This will allow the Government to seek pretrial remedy from the Court if necessary and avoid objection and side-bar argument during the defenses' opening statements.  The Government will, in turn, provide any such materials to the defense if the Government decides to use such materials in opening.  The Government requests that the Court order the parties to exchange those materials two days before opening statements to allow time for either side to raise any objections to the proposed presentations.

### 2.  <u>Good Faith Defense Does Not Apply</u>

The defendants' recently filed jury instructions assert that "good faith" is a complete defense to the honest services wire fraud predicates.  (Doc. 174, PageID 4058-59, 4063-64.)  This proposed "good faith" instruction is, in essence, a "mistake of law" instruction.  Although this is not the forum for litigating jury instructions, the defendants' improper good faith instruction suggests they intend to present this "mistake of law" defense during opening statement or through witness testimony at trial, which is improper.

Courts have recognized that, in bribery cases, a "good-faith" defense is actually a "mistake-of-law defense in disguise or an advice-of-counsel defense without demonstrating advice of counsel" or "a stalking horse for the contention that the *quid pro quo* . . . cannot be implied from hints and nudges."  *United States* v. *Blagojevich*, 794 F.3d 729, 738-39 (7th Cir. 2015) (emphasis in original); *United States* v. *Lindberg*, 476 F. Supp. 3d 240, 275 (W.D.N.C. 2020), vacated on other grounds, 39 F.4th 151 (4th Cir. 2022) (rejecting good faith instruction and explaining, "as usual, mistake of law is not a defense to either of the [bribery] offenses at hand, lest our democratic institutions would fall to corruption under cries of ignorance").

Rather, courts are clear that only proper *mens rea* instructions are appropriate for honest services wire fraud charges. *Blagojevich*, 794 F.3d at 738. "The wire-fraud statute requires a specific intent to defraud but not willfulness or any other proxy for knowledge of the law." *Id*. at 739. Indeed, "[s]ince an 'intent to defraud is essentially the opposite of good faith,' courts routinely recognize that a 'separate instruction on good faith is not required . . . where the court adequately instructs on intent to defraud.'" *Lindberg*, 476 F. Supp. 3d at 276 (quoting *United States* v. *Berroa*, 856 F.3d 141, 161 (1st Cir. 2017) and citing cases); *see United States* v. *Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) (explaining the "only mens rea requirement" for wire fraud is that the "defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value").

"The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system," and the Sixth Circuit recognizes a "limited exception" to that rule "for 'highly technical statutes,' such as tax or banking statutes, [which] require a 'willful' violation of the law." *United States* v. *Trevino*, 7 F.4th 414, 424 (6th Cir. 2021). Honest services wire fraud does not fall under this exception: "bribery, extortion, and honest services wire fraud[] are not 'highly technical,' and none expressly requires a 'willful' violation." *United States* v. *Sittenfeld*, No. 1:20-CR-142, 2022 WL 2192955, at *6 (S.D. Ohio June 17, 2022) (precluding arguments in support of "mistake of law" defense because "numerous Sixth Circuit cases characterize the wire fraud statute as requiring only a 'knowing' violation").

Here, the defendants' jury instructions are inconsistent with this law. They propose: "A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong." (Doc. 174, PageID 4058, 4063.) This is a "mistake of law" instruction –

precisely the type of mistake of law instruction courts have held inapplicable to wire fraud charges. And, based on this instruction, it appears that the defendants intend to present argument or testimony to the jury supporting this instruction, or at least imply that an "honestly held" belief that their actions were legal is a defense to the predicates.  Consistent with the above law, the defendants should be precluded from doing so in the jury instructions and in argument.

### 3.  Merits of House Bill 6 Are Irrelevant

To the extent that the defendants seek to argue or imply the relative merits of House Bill 6 as a defense to the charge, the Government intends to object on grounds of relevance.

Among the predicate racketeering offenses are public official honest services wire fraud, extortion under color of official right, and bribery.  In the context of bribery, the Supreme Court explained: "A [public official] is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid.  (That is frequently the defense asserted to a criminal bribery charge—[] though it is never valid in law[.])" *City of Columbia* v. *Omni Outdoor Ad., Inc.,* 499 U.S. 365, 378 (1991).  The Sixth Circuit's Pattern Jury Instructions reflect this rule:  "It is not a defense to bribery that the public official would have done the official act anyway, even without the receipt of the property."  Sixth Cir. Pattern Jury Inst. 17.02(2)(c)(3) (commentary citing *United States* v. *Brewster*, 408 U.S. 501, 527 (1972); *United States* v. *Evans*, 504 U.S. 255, 268 (1992); *United States* v. *Abbey,* 560 F.3d 513, 518 (6th Cir. 2009)).

This rule is uniformly accepted by courts in bribery cases.  *See United States* v. *Silver*, 948 F.3d 538, 562 n.14 (2d Cir. 2020) ("It is no defense that an official would have taken certain actions regardless of any alleged bribe."); *accord United States* v. *Nagin*, 810 F.3d 348, 351 (5th Cir. 2016); *United States* v. *McDonough*, 727 F.3d 143, 159–60 (1st Cir. 2013); *United States* v.

*Orenuga*, 430 F.3d 1158, 1165–66 (D.C. Cir. 2005); *United States* v. *Quinn*, 359 F.3d 666, 675 (4th Cir. 2004); *United States* v. *Frega*, 179 F.3d 793, 807 (9th Cir. 1999); *United States* v. *Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997); *United States* v. *Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982). "[T]he corrupt intent that is central to an illegal quid pro quo exchange persists even though the [public official's] acts also benefit constituents other than the defendant." *United States* v. *Rosen*, 716 F.3d 691, 701–02 (2d Cir. 2013).

In other words, belief in the legislation's merits is not a defense – knowledge that a public official was "accepting a bribe" is all that is necessary to satisfy the quid pro quo requirement. *Evans*, 504 U.S. at 266, 268 (quid pro quo bribery in the campaign contribution context occurs where "a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts"); *accord United States* v. *Blandford*, 33 F.3d 685, 696 (6th Cir. 1994). Therefore, "it is neither material nor a defense to bribery that had there been no bribe, the public official might, on the available data, lawfully and properly have made the very recommendation that the briber wanted him to make." *Jannotti*, 673 F.2d at 601 (parentheses omitted). Defendant Householder appears to recognize that his belief in the merits of House Bill 6 is not relevant at trial. (Doc. 131, PageID 3624 (Def. Householder's *Daubert* Motion) ("This case is not about energy policy or the regulation of the energy markets. . . . To be sure, HB 6 is a piece of energy legislation, but the trial is not about the merits of HB 6.").)

The jury may hear statements about the contents of the legislation and supposed merits of House Bill 6 incidentally through the evidence in this trial (which includes Defendant Householder's aforementioned press conference on the subject, extolling the virtues of the proposed legislation). But neither defendant should be permitted to present this type of evidence or argument as a defense to the charge here. *See United States* v. *Dunkin*, 438 F.3d 778, 780 (7th

Cir. 2006) (presenting an inapplicable defense "is just an invitation to jury nullification, a practice that is improper").

### 4.  **Defendant Neil Clark's Death Should Not be Raised Before the Jury**

After the charges in his case, Defendant Neil Clark died by suicide.  The fact of his suicide should not be presented to the jury.

First, Clark's suicide is irrelevant to the charge here.  Under Federal Rule of Evidence 401, "[e]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Clark's suicide meets neither prong of the rule.  The conditions that lead someone to take his own life are complex and deeply personal.  His decision makes no pertinent fact in this case more or less probable, and his decision is of no consequence in deciding the guilt of his coconspirators.

Second, even if this fact were relevant—and it is not—it fails the necessary balancing under Federal Rule of Evidence 403.  Under the Rule, relevant evidence must be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, among other factors.  Fed. R. Evid. 403.  If the jury reads anything into Clark's suicide, that interpretation would be unfairly prejudicial to the Government or the defendants, depending on which inference the jury would draw.

The Government will not seek to admit any evidence of Clark's suicide and will object if the defendants attempt to do so.

### C.  **Limits on Number of Character Witnesses**

Federal Rule of Evidence 405 outlines the conditions under which character evidence may be admissible.  Evidence of specific instances of a defendant's good conduct is only admissible "[w]hen a person's character or character trait is an essential element of a charge, claim, or

defense[.]" Fed. R. Evid. 405(b). In determining whether the person's character is such an essential element, "the relevant question should be: would proof, or failure or proof, of the character trait by itself actually satisfy an element of the charge, claim, or defense?" *United States* v. *Clark*, 377 F. App'x 451, 460 (6th Cir. 2010) (quoting *United States* v. *Keiser*, 57 F.3d 847, 856 (9th Cir. 1995) (brackets omitted)). That is not the case here. *See, e.g.*, *United States* v. *Herman*, 589 F.2d 1191, 1197 (3rd Cir. 1978) (Rule 405(b) "unavailable" in RICO prosecution).

That leaves only Rule 405(a), which limits testimony concerning a person's character to "testimony about the person's reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). If either defendant intends to offer such character witnesses at trial, the court should consider exercising its discretion to place reasonable limits on the number of those witnesses called by the defendants.

The Supreme Court and Courts of Appeals "have sought to overcome danger that the true issues [at trial] will be obscured and confused by investing the trial court with discretion to limit the number of character witnesses and to control cross-examination." *Michelson* v. *United States*, 335 U.S. 469, 480 (1948) (affirming conviction in bribery case). Following the Supreme Court's decision in *Michelson*, the Sixth Circuit as well as other circuits have upheld a district court's limitation of defense character witnesses. *See United States* v. *Sexton*, 119 F. App'x 735, 745–46 (6th Cir. 2005), vacated in part on other grounds after rehearing; *United States* v. *Moss*, 34 F.4th 1176, 1188-89 (11th Cir. 2022) (health care fraud case); *United States* v. *Scholl*, 166 F.3d 964, 972 (9th Cir. 1999) (tax fraud and structuring case); *United States* v. *Gray*, 105 F.3d 956, 963 (5th Cir. 1997) (affirming convictions where court limited each defendant to two character witnesses in multi-defendant mail fraud and conspiracy case).

In *Sexton*, the trial court limited the defendant to three character witnesses who offered testimony about his law-abiding reputation. *Sexton*, 119 F. App'x at 745-46. After his conviction, the defendant appealed the district court's limitation on character witnesses, among other things. *Id*. On appeal, the Sixth Circuit noted that the district court properly exercised its discretion to limit the number of character witnesses and explained that "[f]urther witnesses testifying to these matters would have been redundant." *Id*.

If the defendants intend to call such witnesses, the Government requests a reasonable limit on the number of witnesses who may present such evidence.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

*s/Megan Gaffney Painter*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
MEGAN GAFFNEY PAINTER
(NY 4849220)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Trial Brief was filed electronically this 6th of January, 2023, and served upon all counsel of record via the Court's CM/ECF system.

*<u>s/Megan Gaffney Painter</u>*
MEGAN GAFFNEY PAINTER
Assistant United States Attorney